## Fidelity-Philadelphia Trust Co. v. Schuylkill Traction Co. et al.

A. L. *Shay*, for petition; *Ruby Vail*, for objecting bondholders.

M. A. *Kieker*, for Philadelphia-Equitable Trust Co.

KOCH, P. J., June 4, 1928.—The receivers ask for authority to issue their certificates for $100,000, of which amount they desire to issue $60,100 to meet certain immediate requirements and the balance thereafter, from time to time, as the court may direct upon application of the receivers. The application is opposed by counsel who claim to represent owners of bonds in the aggregate amounting to $317,600.

From the pleading and the evidence, I find the following

*Facts.*

1. The properties committed to the charge of the receivers consist of four street railways which have been operated as one system by the Schuylkill Railway Company. For the most part they lie within the County of Schuylkill and did afford a means of transportation between the towns of Saint Clair, Frackville, Gilberton, Mahanoy City, Shenandoah, Girardville, Ashland and other places.

2. Each of the original railway properties is heavily mortgaged and, in addition thereto, are certain general mortgages.

3. A financial statement of the Schuylkill Railway Company for the six months ending June 30, 1927, showed that it was not earning its operating expenses, and, when that fact became known to the Fidelity-Philadelphia Trust Company, the latter, as trustee for the holders of certain mortgage bonds, presented its bill in equity to this court, praying for the appointment of receivers, and, in due course, the present petitioning receivers were appointed on Sept. 26, 1927, and promptly entered upon the discharge of their duties as such.

4. At the time of the appointment of the receivers, the whole railway system, excepting a small portion, was in operating condition and was being operated, but after four days, to wit, on Oct. 1, 1927, all the motormen and conductors struck and the entire system has been idle ever since that date. Nor does the prospect of an early resumption of operation yet seem apparent.

5. When the said employees quit work on Oct. 1, 1927, the accumulated wages to that date, but not yet due, aggregated the sum of $6581.60. There

was then also due to the Pennsylvania Light and Power Company the sum of $17,198.49 for electric current, and the Schuylkill Railway Company is further obligated to said power company at the rate of $2500 per month as a stand-by charge ever since Oct. 1, 1927. But the receivers would expect to have that stand-by charge abrogated if they were allowed to issue receivers' certificates and to deposit $10,000 as security for the prompt payment of future monthly bills as they accrue for electric current and if they would agree to pay off said $17,198.49 in monthly instalments of $1500 each after the operation of the railways again begins.

6. Taxes which were claimed by the Commonwealth at the time of the appointment of the receivers and which have since then accrued, amount to $40,000, but the receivers contend that the actual amount is about $27,000. They aver that the delinquent taxes amount to $15,000.

7. There is also due for principal and interest the sum of $13,660 on a certain car trust lease, dated June 19, 1919, and the further sum of $11,240 for principal and interest on a certain equipment trust lease agreement, dated June 1, 1924.

8. The premiums for insurance on the defendant's insurable property amounted to $1796.30 on Feb. 2, 1928, and the money to pay the same was lent to the receivers by the Schuylkill Transportation Company, an unallied motor-bus corporation, which is mostly, if not entirely, owned and controlled by one Powell Evans, who is also the dominant factor in, and president of, the Schuylkill Railway Company. The Schuylkill Transportation Company has, since the said strike, served the public with motor-bus accommodations in the field theretofore served by said street railway system.

9. The Reading Railway Company applied for a charter to operate motor-busses in certain territory served by its railway system and the said Schuylkill Railway and said Schuylkill Transportation Companies opposed the granting of said charter, and in that behalf expended $2000 for legal expenses, etc., which sum was advanced by said Powell Evans in November and December, 1927. This amount is characterized as a loan to the receivers of the Schuylkill Railway.

10. Since the appointment of the receivers, they have paid out in salaries and wages and for workmen's compensation about $9840.31, all of which has been advanced by the Schuylkill Transportation Company. Of the said salaries so paid, we note $718 per month to James D. Evans and $300 per month to Erwin Suransky, the former being the vice-president and the latter the auditor of the Schuylkill Railway Company. Said James D. Evans is also one of the said receivers.

11. During the last eight months and since the operation of the property has ceased, it has fallen into a bad state of repair and it has also been greatly injured by certain felons who cut out and removed much overhead trolley wire and some bonding. Subsidence of the surface, which was caused by mining, has suspended the railway tracks in the air at some places for a distance of as much as 100 to 150 feet, and it will require possibly $40,000 to put all of the system in a condition fit for safe and efficient operation.

12. The railway system is spoken of as composed of four divisions, two of which are unable to earn enough money to properly take care of themselves, and it is proposed to first prepare and put into operation the division which is most likely to earn more than operating expenses; then to follow that by preparing and putting into operation the next most promising division, and thereafter to treat the other divisions in the same manner. A few weeks' time would be required for such treatment of each division. The lengths of

the divisions seem to vary. The estimated cost of putting the first division into repair is $10,000. Once that is repaired, the receivers think its income will furnish the means to put the next division in repair, and, with the receipts from these two divisions, they would expect to pay for putting the other two divisions in repair. But we have been furnished with no statement of the earnings and cost of operation of any of the divisions. It is, however, clearly evident that the Schuylkill Railway Company is hopelessly insolvent.

13. I find the receivers are correct in saying in their petition: "The financial structure of the property confided to our charge is, in our opinion, overburdened and unbalanced by the weight of interest charges not reasonably apportioned according to the ability of the respective mortgaged divisions of the system to earn and pay the interest with which they are respectively charged." No way in which to reduce that burden and create a proper balancing of the several properties has been suggested by the receivers. Perhaps it could be accomplished by mutual agreement among all the parties in interest—an extremely problematical matter for any one to undertake. Otherwise, foreclosure proceedings remain as the only apparent means to bring about the final solution of the various questions which concern the rights and equities of all.

### Discussion.

The evidence fails to pursuade us that this railway system can be operated at a profit at this time or within a reasonable time in the future. The use of privately-owned automobiles, if nothing else, makes it impossible to operate the system at a profit to the stockholders. It has never earned a dividend. There is no sign that it can earn even nearly enough to pay interest on the bonds for which the properties are mortgaged. Nor has it been shown that, if the receivers' certificates prayed for be issued, the lien of the certificates can be discharged within a reasonable time or that such lien can ever be discharged. This is not a present "going concern," save in the sense that it is going downwards. It is apparently utterly and hopelessly insolvent. It now serves no public purpose whatever. And there is no assurance that men can be obtained in the near future to operate the property peaceably and properly.

The receivers went on record when the testimony was being taken on this application that the certificates of public convenience, under which the Schuylkill Transportation Company is operating motor-busses in the territory of the Schuylkill Railway Company, will not be turned over to the Schuylkill Railway if this court makes an order for the issuance of receivers' certificates. Why they should so emphatically stand for the interest of the man who virtually owns both the transportation company and the companies that the receivers represent, I do not know. Their attitude in the premises is not entirely clear. The defendants here now include all the companies whose railways compose the system operated by the Schuylkill Railway Company, and the parties therein interested may not wish to find complications in their way should they attempt to establish a motor-bus line to succeed their railway lines.

If there were indications sufficient to warrant the belief that this railway system could be operated so as to pay off within a reasonable time the certificates asked for, we would gladly take the responsibility of ordering the issuance thereof. But such are not the present indications, and we have no right to put in greater peril the interests of the bondholders. We fear that a prior lien of $100,000 for such certificates would ultimately wipe out all the security of the bondholders. We feel that the bondholders, or their successors,

should be put into control of the property as early as possible so that they may decide for themselves whether or not the property is worth rehabilitation and continued operation, or whether they should realize what they can by scrapping any or all of the property. Once they get the property into their own possession, they may scrap it and organize an autobus company for the territory now served by the railroads. Their application for certificates of public convenience would undoubtedly receive consideration by the Public Service Commission. To proceed further in experimenting with the present railway system under the ownership of the stockholders would, in my opinion, be futile and disastrous to the people who are now the real parties in interest, namely, the bondholders. If any of the present claims are prior in right to the lien of the mortgages, such priority may continue under the receivership and will be taken care of under foreclosure proceedings, and such as are not now prior in right should not be attempted to be made so by us, unless our duty is made to clearly appear. And until it is made clear, we shall let a higher court direct the allowance of the petitioners' prayer, so that the responsibility for greater loss on the part of the bondholders will not rest with us. The future success of the railway system is so far from being assured that we feel that it is not only improbable, but that it is altogether impossible. And, so feeling, we would be guilty of a gross abuse of discretion were we to authorize the issuance of receivers' certificates for all the purposes stated in the schedule to the petition.

The petition is dismissed, the petitioners are allowed an exception and bill is sealed.

From M. M. Burke, Shenandoah, Pa.